IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Thomas Spina, | : |
| Plaintiff, | : |
| v. | : No. 14-cv-04230 |
| Refrigeration Service and Engineering, Inc., et al., | : |
| Defendants. | : |

**DEFENDANT, REFRIGERATED SERVICE AND ENGINEERING, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION TO ENFORCE RIGHTS**

Defendant, Refrigeration Service and Engineering, Inc. ("RSE" or the "Corporation"), submits this Memorandum of Law in support of its opposition to the Motion to Enforce Rights Under Section 1508 of the Pennsylvania Business Corporation Law filed by Plaintiff, Thomas Spina ("Spina").

INTRODUCTION

This Motion is a thinly veiled attempt to avoid the automatic stay of discovery mandated by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b)(3)(B). Spina has filed a claim for violations of the federal securities laws, and the Defendants have moved to dismiss that claim. Therefore, the automatic stay under the PSLRA clearly bars the relief requested by this Motion.

More troubling than Spina's attempt to end-run the statutory mandate under the PSLRA, however, is the bad faith in which he has brought, and prolonged, this litigation. As discussed in the papers previously filed with the Court, and as discussed again below, all of the shareholders of RSE, including Spina, decided to sell the business to Stellar Refrigeration Services LLC

("Stellar") in exchange for continued employment of all of RSE's employees, including Spina and the two other 30% shareholders (the "Stellar Deal"). Spina, however, was not happy with Stellar's employment offer, and demanded that the other shareholders reject the Stellar Deal until and unless Stellar increased his personal compensation package. The other shareholders refused to do so, and voted in favor of proceeding with the sale to Stellar.

In response, Spina (through the use of legal process, threats of legal action, and the filing of this utterly frivolous litigation) blew up the Stellar Deal, thereby causing RSE to lose $475,000 in income which would have been available for distribution to all of its shareholders, including Spina. RSE is now going through a voluntary dissolution.

Notwithstanding the fact that he successfully sabotaged the Stellar Deal and cost RSE $475,000, Spina has continued with this litigation and, as a result, is continuing to cause the Corporation to expend its precious few resources in defending this wholly frivolous lawsuit. This Motion is just the latest tactic in his effort to deplete the liquid assets of the Corporation.

Spina's litigation tactics make no economic sense. As a shareholder of RSE, he would be entitled to a percentage of the Corporation's net income after payment to all creditors. His continuation of this lawsuit is not only harming the economic interest of the other shareholders; it is harming his own economic interest as well.

In short, the only rational explanation for Spina's conduct is that he is attempting to either extort a settlement whereby he retains his 30% interest in the Corporation without having to pay for it; or, he is determined to deplete the Corporation's liquid assets so that there is nothing left to distribute to the shareholders. This is his true purpose in prosecuting this litigation, and in filing this Motion.

## RELEVANT FACTUAL BACKGROUND

### Plaintiff's Acquisition of RSE Stock

Spina obtained his stock in RSE in December 2011 in connection with a merger between RSE and Industrial Refrigeration and Engineering, Inc. ("IRE"). Spina was a shareholder and officer of IRE, and RSE Is the surviving entity from that merger.

Pursuant to the terms of the merger, Spina received 90 shares of RSE stock in exchange for his interest in IRE, and purchased an additional 308.4 shares from Defendants, Robert Hepp ("R. Hepp") and Cynthia Fitzgerald-Hepp ("C. Hepp") for $294,000. This purchase price is to be paid off over a five year period (the "Stock Debt"). The Stock Debt is documented by two Notes and a Security Agreement, and is secured by the 308.4 shares of RSE stock that Spina purchased from the Hepps (the "Collateral"). According to the Notes and Security Agreement governing the Stock Debt, if Spina defaults on the Stock Debt, the Hepps can take back title to some or all of the Collateral.

Pursuant to the Notes, in each of the first four years, Spina is required to pay the Hepps collectively a minimum of $55,000 per year in principal (the "Annual Principal Payment"), plus interest at the rate of 1.3% per year (so long as his annual shareholder distribution is $80,000 or more). The Annual Principal Payment is due at by the end of each year. In the fifth year, Spina is required to pay off all outstanding principal and interest owed on the Stock Debt.

### Spina's 2012 Annual Principle Payment and the Dellose Payment

For the first year (2012), Spina did not pay all of the Annual Principal Payment, at least not in cash. Instead, Spina requested that the Corporation pay a personal obligation of the Hepps, and credit that payment toward Spina's 2012 Annual Principle Payment. More specifically, Spina requested that RSE pay for certain contract work being done for the Hepps by

3

a company called Dellose Construction ("Dellose"), and that this payment be credited to the 2012 Annual Principal Payment due under the Notes.

The other three shareholders agreed to accommodate Spina in this manner. As a result, Spina's 2012 Annual Principal Payment was credited for that $36,600 that RSE paid to Dellose (the "Dellose Payment"), and the balance of the 2012 Annual Principal Payment ($18,400) was paid by Spina (the following year). In other words, as an accommodation to Spina, RSE and the other shareholders agreed to let the Corporation pay two-thirds ($36,600) of Spina's personal obligation to the Hepps for 2012, and the Hepps accepted late payment of the remaining balance ($18,400).[1]

In the second year (2013), Spina paid the entire Annual Principal Payment he owed under the Notes. Therefore, if he receives credit for full payment in the first two years, Spina presently owes $184,000 in principal under the Notes. However, as discussed below, that may change do to either (a) his assertions in this lawsuit that the Dellose Payment was not authorized and/or (b) his failure to make the Annual Principal Payment due in 2014.

In an attempt to rewrite history and create a factual dispute for the purposes of prolonging this frivolous litigation, Spina is now claiming that the Dellose Payment was not authorized and agreed to by all of the shareholders. Now, he contends that this payment was an unauthorized use of the funds of RSE, and repeatedly characterizes the Dellose Payment as a misappropriation of corporate assets by the Hepps. He is doing this in a desperate attempt to create some sort of

---

[1] The Hepps could have declared a default in January 2013 and taken back all of the stock sold to Spina. Instead, they, along with the third shareholder (Ken Philo), essentially took money out of their own pocket to satisfy Spina's legal obligation to the Hepps. As discussed herein, Spina is now recasting their generosity as a purported act of corporate mismanagement to support his frivolous lawsuit.

4

factual basis for virtually every claim for relief he has requested in the Complaint, and for each motion he has filed to date, including this Motion.[2]

The irony is that by making these false accusations, he is jeopardizing his ownership interest in the Corporation. If, in fact, there was no agreement to credit the Dellose Payment to Spina's 2012 Annual Principal Payment, then Spina currently owes $220,600 in principal to the Hepps. More importantly, without credit for the Dellose Payment, Spina is in default of the Stock Debt and the Hepps could, therefore, take legal ownership of the Collateral. If that were to happen, Spina's shareholder interest in RSE would be reduced from 30% to as low as 6.7%. Therefore, his litigation strategy is clearly jeopardizing the extent of his ownership interest in RSE.[3]

## The Stellar Deal

In 2013, the Corporation began to look for a buyer of the business, and had discussions with several third parties in that regard. Those discussions were uneventful. In the first quarter of 2014, RSE and Stellar began negotiating the Stellar Deal. The concept was for Stellar to purchase the majority of RSE's hard assets and, most importantly, transition all of RSE's employees onto Stellar's payroll over a certain period of time (the "Stellar Deal"). Stellar was

---

[2] To the extent it is needed to adjudicate this Motion, attached as Exhibit "A" is a verification of Robert Hepp refuting Spina's story regarding the Dellose Payment.

[3] It may very well be that Spina has no intent to make the Annual Principle Payment due in 2014 and, therefore, expects his shareholder interest to be significantly reduced in the near future. If that is his plan, then it is even more obvious that he has filed this lawsuit solely to either extort a settlement or dissipate the Corporation's net income so that there is nothing left to distribute to the other shareholders.

not acquiring RSE's receivables. The value to Stellar in this deal was not in the hard assets of RSE; it was in the employees of the Corporation and the continuity of its customer base.[4]

Defendant, R. Hepp, negotiated with Stellar on behalf of RSE. Contrary to Plaintiff's unsubstantiated accusation, R. Hepp routinely kept the other shareholders informed of the status of the negotiations and the events related thereto. *See* assorted emails to the shareholders attached to RSE's Opposition to Plaintiff's Motion for Judicial Intervention as Exhibit "A". During this time period, all of the shareholders were in favor of the Stellar Deal, **including Spina**.

### Stellar's Employment Offer to Spina

As part of the Stellar Deal, Stellar was to make offers of employment to **all** of RSE's employees, and to three of the shareholders (Spina, Philo and R. Hepp). In April 2014, Spina received Stellar's employment offer and was not happy with its terms. He wanted more money. Spina also wanted the other shareholders (in particular R. Hepp) to hold out with him until Stellar agreed to pay Spina substantially more than what was offered. R. Hepp and the other shareholders refused to do so. At that point in time, Spina changed his position with respect to the Stellar Deal, and plotted his revenge.

### Spina Exacts Retribution on RSE and the Other Shareholders

After R. Hepp and the other shareholders refused to hold out until and unless Stellar agreed to pay Spina more money, Spina started to take steps to exact retribution. He stopped performing his duties as an officer and employee of RSE and (unbeknownst to the other

---

[4] The assets that were to be sold to Stellar were primarily trucks and tools, for which Stellar agreed to pay $475,000. As a result of Spina's tortuous interference with the Stellar Deal, those assets are now being liquidated for pennies on the dollar.

shareholders) went to work for a competitor known as "RD&S". Spina also hired employees away from RSE and took RSE clients as well.

To further harm RSE, Spina filed, in bad faith, a wholly frivolous twenty-one count lawsuit against the Corporation and its shareholders. This lawsuit lacks any factual basis and was instituted primarily to obstruct the Stellar Deal and deplete RSE's net income. To that end, the Complaint filed by Spina alleged that RSE lacked the lawful authority to sell its assets to Stellar.[5] In addition, Spina, through his counsel, threatened Stellar with the prospect of incurring significant legal defense fees if it purchased assets from RSE. *See* Exhibit "D" to RSE's Motion to Dismiss. As a result of the Complaint and the threats from Spina's counsel, Stellar terminated the Stellar Deal.

Stellar was going to pay $475,000 for the hard assets of RSE. Stellar was clearly over paying for those assets in order to make the deal work. Now, as a direct result of Spina's tortuous interference with that deal, those assets will be publicly auctioned and are expected to bring in a fraction of the $475,000 that Stellar was willing to pay.

Not satisfied with obstructing the Stellar Deal, Spina has also sought judicial intervention with respect to the liquidation of the Corporation's assets, even though there is no legal or equitable basis for doing so. If he prevails, a receiver will be appointed to oversee this liquidation, which will further deplete the Corporation's net income.

Now, Spina seeks an order permitting him to conduct a *carte blanch* inspection of RSE's files. Since his intent is to continue to deplete RSE's assets through prolonged litigation, his primary purpose in seeking this document review is a fishing expedition for any "dirt" that will

---

[5] A motion to dismiss the Complaint in its entirety is currently pending. Yesterday, (August 12, 2012), Spina filed an Amended Complaint which contains the same federal securities fraud counts as the initial Complaint. Another motion to dismiss will be timely filed in response to the Amended Complaint as well.

assist him in that regard. His strategy is to either coerce a settlement whereby the Corporation and the Hepps allow Spina to retain his 30% interest without having to pay the Stock Debt, or deplete RSE's net income so that the other shareholders get nothing out of the liquidation. In other words, he is extorting RSE and the other shareholders to give him more than he is legally entitled to receive. This Motion is part of his extortion plan.

Spina's litigation strategy simply makes no economic sense. His continued litigation is only hurting his own economic interest; along with the economic interests of the other shareholders. The lack of rationality with respect to this litigation speaks to his true purpose for seeking to inspect the Corporation's documents.

## LEGAL DISCUSSION

In this Motion, Plaintiff contends that he has the right to inspect a litany of documents pursuant to the 15 Pa.C.S. §1508, which is the Pennsylvania statute governing a shareholder's right to inspect the records of a corporation. This statute states, in relevant part:

§1508. Corporate records; inspection by shareholders.

(b) *Right of inspection by a shareholder:* Every shareholder shall, upon written verified demand stating the purpose thereof, have a right to examine . . . . . . the share register, books and records of account, and records of the proceedings of the incorporators, shareholders and directors and to make copies or extracts there from. A proper purpose shall mean a purpose reasonably related to the interest of the person as a shareholder.

\* \* \* \* \* \* \* \* \* \*

(c) *Proceedings for the enforcement of inspection by a shareholder:* If the corporation . . . . refuses to permit an inspection sought by a shareholder . . . . . . . the shareholder may apply to the court for an order to compel the inspection. The court shall determine whether or not the person seeking inspection is entitled to the inspection sought. . . . . . Where the shareholder seeks to inspect the books and records of the corporation, other than its share register or list of shareholders, he shall first establish:

    (1)    That he has complied with the provisions of this section respecting the form and manner of making demand for inspection of the document.

>    (2)   That the inspection he seeks is for a proper purpose.
>
> Where the shareholder seeks to inspect the share register or list of shareholders of the corporation and he has complied with the provisions of this section respecting the form and manner of making demand for inspection of the documents, the burden of proof shall be upon the corporation to establish that the inspection he seeks is for an improper purpose. The court may, in its discretion, prescribe any limitations or conditions with reference to the inspection or award such other or further relief as the court deems just and proper. The court may order books, documents and records, pertinent extracts there from, or duly authenticated copies thereof, to be brought into this Commonwealth and kept in this Commonwealth upon such terms and conditions as the order may prescribe.

For the reasons discussed below, Plaintiff's motion should be denied.

1.  <u>The Relief Sought By Plaintiff Is Barred By The PSLRA</u>

Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b)(3)(B), discovery is automatically stayed in an action for violation of the federal securities laws once a motion to dismiss has been filed. Such a motion is currently pending in the case at bar (and another motion to dismiss will be filed in a timely manner with respect to the Amended Complaint filed yesterday by Spina). Therefore, Plaintiff is prohibited by the PSLRA from engaging at this time in the fishing expedition that he seeks to conduct.

Plaintiff's motion to inspect corporate records is simply an attempt to avoid this statutorily mandated stay of discovery. RSE is unaware of <u>any</u> reported decision in which a party to a federal securities fraud case has been permitted to inspect corporate records while a motion to dismiss is pending. The PSLRA is very direct on that issue.

Typically, issues regarding the application of the PSLRA's automatic stay arise when there is a related state court case in which discovery is sought which could infringe upon the stay of discovery in the federal securities action. In such situations, the federal court may use its authority under §78u-4(b)(3)(D) of the PSLRA, which authorizes the federal court to "stay discovery proceedings in any private action in a **state court**, as necessary in aid of its

9

jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph." 15 U.S.C. §78u-4(b)(3)(D) (emphasis added). *See, also, Newby v. Enron Corp.,* 338 F.3d 467, 473 (5th Cir. 2003) (affirming stay); *Schwartz v. TXU Corp.,* 2004 WL 1732477, at p.2, 2004 U.S. Dist. LEXIS 14782, at p.6 (N.D. Tex. July 30, 2004); *Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.),* 293 B.R. 337, 355 (Bankr. S.D.N.Y. 2003).

Plaintiff has cited no case law which supports his argument that the PSLRA does not prohibit the relief he seeks. Plaintiff claims, however, that the decision in *Cohen v. El Paso,* 2004 Del. Ch. LEXIS 149, WL 2340046 (Del. Ch. 2004)(the "Cohen Action"), somehow supports his cause. It does not.

*Cohen* involved a state court proceeding related to a pending federal securities fraud action. Prior to the institution of the *Cohen* lawsuit, a number of securities fraud class actions were filed against the El Paso Corporation. In 2004, those class actions were consolidated in the United States District Court for the Southern District of Texas under the caption of *Oscar S. Wyatt, Jr. v. El Paso Corp.*, C.A. No. H-02-2717 (the "Wyatt Class Action"). A motion to dismiss was filed in the Wyatt Class Action, which automatically stayed discovery in that case pursuant to the PSLRA.

Thereafter, Mr. Cohen, a shareholder of El Paso, filed a separate lawsuit in Delaware state court seeking an order to allow him to inspect certain corporate records pursuant to Section 220 of the Title 8 of the Delaware Code (8 Del. C. §220). The only relief sought in the Cohen Action was the right to inspect corporate documents under Delaware law. There were no allegations of securities fraud (or any other substantive causes of action).

El Paso filed a motion in the state court to stay or dismiss the Cohen Action due to the PSLRA's automatic stay of discovery in the pending federal Wyatt Class Action. The Delaware Chancery Court denied that motion, specifically noting that there was no indication of any intent that the *Cohen* plaintiff would share the information obtained in that action with the *Wyatt* plaintiffs, and that the *Cohen* plaintiff was willing to enter into a confidentiality agreement in that regard. Therefore, the *Cohen* court allowed the §220 action to proceed under Delaware law.

Shortly after the *Cohen* court denied the motion to stay the Cohen Action, the federal court in the Wyatt Class Action issued an order **staying the Cohen Action**. *See City Of Austin Police Retirement System v. ITT Educational Services, Inc.*, 2005 U.S. Dist. Lexis 1646 at pp. 23-24 (discussing *Wyatt* and *Cohen* cases).

Therefore, the only decision cited by Plaintiff as support for his effort to end-run the PSLRA (i) involved a state court lawsuit separate from the federal securities action; (ii) which was not filed by a named party to the federal securities action; (iii) which did not assert a claim of securities fraud; (iv) in which the state court plaintiff agreed to not share the information with the parties in the federal securities action; and (v) in which discovery was ultimately stayed by the federal court handling the federal securities action based on subsection D of the automatic stay provision in the PSLRA.

It is more than a stretch to suggest that the *Cohen* decision supports Plaintiff's Motion in any way. Accordingly, this Motion seeks relief that is prohibited by the PSLRA and must be denied.[6]

---

[6] It is also questionable whether Plaintiff has properly raised this requested relief in this Court. The statutory right to inspect corporate documents is typically asserted by way of an independent action seeking such relief. It is not a discovery request. In the case at bar, Plaintiff's Complaint and Amended Complaint do not contain a cause of action for enforcement of his rights under §1508. He is currently before this Court based on allegations of securities fraud, and now seeks his "new" relief via a motion, as if he was seeking a ruling on a discovery request.

    2.    <u>Plaintiff's Primary Purpose For Inspecting These Records Is Not Proper</u>

Under Pennsylvania law, a record stockholder of a corporation is entitled to inspect corporate books and records if (i) the form and manner requirements for making a demand are met; and (ii) the inspection is for a "proper purpose" which is "reasonably related to the interest of the person as a shareholder." 15 Pa.C.S. §1508. The statutory right to inspect corporate documents, however, is not absolute. It rests on conditions of propriety and reasonableness. *Goldman v. Trans-United Industries. Inc.*, 171 A.2d 788, 790 (Pa. 1961).

Inspection will not be permitted where the purpose is proven to be improper or unreasonable. *Strassburger v. Philadelphia Record Co.*, 335 Pa. 485, 6 A.2d 922 (Pa. 1939). Nor will it be permitted for speculative purposes or blackmail. *Klein v. Scranton Life Insurance Co.*, 139 Pa. Super. 369, 376, 11 A.2d 770, 773 (Pa. Super. 1940)(an inspection of corporate records should not be permitted for "speculative purposes" or to. . . gratify idle curiosity or to aid a blackmailer . . . .").

The term "proper purpose" has been construed to mean that a shareholder's **primary purpose** must be proper, irrespective of whether any secondary purpose is proper. *CM & M Group, Inc. v. Carroll,* Del. Supr., 453 A.2d 788, 792 (1982); *Helnsman Management Serv. v. A & S Consult,* Del. Ch., 525 A.2d 160, 164 (1987) (emphasis added).[7] Additionally, **the primary**

---

[7] There are very few reported Pennsylvania decisions which address the application of §1508, and those decisions do not address its application under facts similar to the case at bar. Delaware law, however, is more developed in this regard, and Pennsylvania's shareholder inspection statute is very similar to the Delaware statute. *Cf.* 15 Pa.C.S. §1508 and 8 Del. C. §220. Therefore, where appropriate, decisions from the Delaware courts are discussed or cited herein. *Accord Mitchell Partners, L.P., v. Irex Corporation,* 656 F.3d 201, 215 (3rd Cir. 2011) (recognizing that in matters of Pennsylvania corporate law, although Delaware decisions are not controlling, they have "persuasive force and to the extent that Delaware represents the vanguard of corporate law, they are certainly worth noting."); *In re Glosser Bros., Inc.,* 382 Pa. Super. 177, 555 A.2d 129, 134 (Pa. Super. Ct. 1989) (specifically noting Delaware's "expertise in these matters").

**purpose may not be adverse to the corporation's best interest**. *Thomas & Betts Corp. v. Leviton Mfg. Co.*, Del. Ch., 685 A.2d 702, 709 (1995), *aff'd* 681 A.2d 1026 (1996); *Norfolk Cnty. Retirement Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 Del. Ch. LEXIS 20 at p.16 (Del. Ch. 2009)(citing *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 565 (Del. Ch. 1998)).

Moreover, a court "is not required to accept without question a plaintiff's stated purpose as being its true purpose." *Norfolk Cnty. Retirement Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at p.11 (Del. Ch. 2009) (footnote omitted), *aff'd*, 977 A.2d 899 (Del. 2009).  Where a defendant shows that Plaintiff's primary purpose is improper, a shareholder's inspection should be denied.  *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 819 (Del. Ch. 2007) (finding shareholder's actual purpose was an improper one and denying inspection).

Plaintiff asserts two purported purposes for the need to inspect the corporate records: (1) his desire to determine if the company is being properly managed, and (2) his desire to determine the value of his shares. Neither of these reasons are his true purpose for seeking this wide ranging records inspection.[8]

Spina's true purpose for seeking this relief is his desire to use this litigation to deplete the Corporation's funds until and unless RSE, and its shareholders, agree to release him of the Stock Debt and award him an unencumbered 30% interest in the Corporation.  Absent that agreement, his purpose is to deplete RSE of its cash through the costs of litigation.  That is not a proper purpose under §1508.

---

[8] Spina contends that he provided four proper purposes for this inspection.  Three of them - - the propriety of expenditures since 2011; the fairness of the Stellar Deal; and the scope and magnitude of misconduct by the other shareholders - - all are a variation of purported mismanagement.  The fourth stated purpose is the purported need to assess the "Fair market value" of his RSE stock.

13