IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS SPINA, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No. 14-4230 |
| REFRIGERATION, SERVICE AND ENGINEERING, INC., et al., | : | |
| Defendants. | : | |

**FILED**
DEC 2 2 2014
MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                **DECEMBER 22 , 2014**

Presently before this Court is Defendant, Refrigeration, Service and Engineering, Inc.'s, Motion to Dismiss the Amended Complaint[1], Plaintiff, Thomas Spina's, Response in Opposition, and Defendant's Reply thereto. For the reasons set forth below, Defendant's Motion is granted.

I.     **BACKGROUND**

        **A. The Parties**

Plaintiff, Thomas Spina ("Plaintiff"), is a resident of the Commonwealth of Pennsylvania. Am. Compl ¶ 1. Plaintiff is a partial owner of Refrigerator, Service and Engineering, Inc. ("RSE").

Defendant, RSE, is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania. Id. at ¶ 2. RSE is the surviving company following a merger with Industrial Refrigeration and Engineering, Inc. (IRE). Id. at ¶ 11. Defendants, Robert Hepp ("Robert Hepp") and Cynthia Hepp ("Cynthia Hepp") (collectively, the "Hepps") are adult

---

[1] This Motion was subsequently joined by all Defendants. See Notice of Joinder (Doc. Nos. 20, 21.)

1

residents of Lansdale, Pennsylvania. Id. at ¶¶ 3-4. Defendant, Kenneth Philo ("Philo"), is an adult resident of Phoenixville, Pennsylvania. Id. at ¶ 5. Robert Hepp, Cynthia Hepp and Philo (collectively the, "Individual Defendants") own the remaining shares of RSE not possessed by Plaintiff. Id. at ¶ 12.

### B. Plaintiff's Claims Against Defendants

On August 11, 2014, Plaintiff filed an Amended Complaint consisting of eighteen (18) counts for alleged breaches of statutory and common law. In the Amended Complaint, Plaintiff divides the claims into four separate categories: (1) the purchase and sale of securities resulting in the merger of IRE and RSE, (2) shareholder derivative claims, (3) the alleged looting of RSE, and (4) an additional claim for civil conspiracy.

Plaintiff alleges the following claims related to his purchase of RSE securities: Securities Fraud[2]; Control Person Liability[3]; Fraud and Intentional Misrepresentation; and Negligent Misrepresentation. Id. at ¶¶ 122-170. In addition, Plaintiff raises the following shareholder derivative claims against the Individual Defendants: Breach of Fiduciary Duties; Corporate Waste; Diversion and Usurpation of Corporate Opportunity; Self-Dealing; Breach of Duty of Loyalty; Conflicts of Interest; Interested Director Transactions; Unjust Enrichment; and Conversion. Id. at ¶¶ 171-218. Furthermore, Plaintiff's claims against the Individual Defendants arising from the alleged looting of RSE's going concern value include: Breach of Fiduciary Duty; Interested Shareholder Transactions; Minority Shareholder Oppression; and Anticipatory Breach and/or Repudiation of Contract. Id. at ¶¶ 219-254. Finally, Plaintiff raises a claim for civil conspiracy against the Individual Defendants. Id. at ¶¶ 255-261.

---

[2] Specifically, Plaintiff alleges violations of 78 U.S.C. § 78j and S.E.C. Rule 10b-5. Am. Compl. ¶ 124.

[3] Plaintiff asserts this claim solely against Defendant Robert Hepp. Am. Compl. ¶146.

2

## C. The Merger

Prior to the merger, RSE and IRE were managed and operated under the direction of Robert Hepp. Id. at ¶ 11. Robert Hepp was the controlling shareholder of RSE while Plaintiff owned a one-third stake in IRE. Id. at ¶¶ 13-14. Although, RSE billed IRE for overhead, rent and administrative expenses, Plaintiff contends that IRE contributed most of the expertise and customer relationships on which the combined enterprise depended. Id. at ¶¶ 13, 15. At some point before December of 2011, Plaintiff and Defendants began to discuss the possibility of a merger between RSE and IRE. Id. at ¶ 17. The Hepps and RSE believed that a merger was necessary to eliminate redundancies and create economies of scale, and that RSE should be the surviving company. Id. at ¶¶ 16, 21.

In the weeks leading up to the merger, Robert Hepp acknowledged to Plaintiff that he would receive his interest in RSE by means of a simple exchange of his shares in IRE. Id. at ¶ 19. However, at a later meeting between the Hepps, Plaintiff and Kathleen P. DiStefano, C.P.A., Plaintiff was informed by the Hepps that he would be obliged to pay cash along with his shares in IRE for the new shares of RSE. Id. at ¶ 20. No cash amount was discussed at this meeting. Id.

The merger was completed on December 29, 2011, with IRE being dissolved into RSE. Id. at ¶ 11. Prior to the signing of the merger agreement, Plaintiff was presented with a document labeled "Business Valuations" (the "Haas Report"), which was prepared by Victor Haas Jr. of Haas Business Valuation Services, Inc.[4] Id. at ¶ 22; see also Id. at Ex. A. This report valued RSE at $1,507,000 and IRE at $672,000. Id. at ¶ 33. In light of these figures, the Hepps and RSE required Plaintiff to provide his thirty three and one-third percent (33-1/3%) stake in

---

[4] In total, on December 29, 2011, the Hepps presented Plaintiff with the following documents: the Haas Report, the Stock Purchase and Sale Agreements, the Stock Pledge and Security Agreements and the Promissory Notes. Am. Compl. at ¶ 39.

3

IRE plus $294,000 to obtain a thirty percent (30%) stake in RSE. Id. at ¶¶ 23-24. The Hepps instructed Plaintiff that he was expected to sign the merger agreement on this same date. Id. Plaintiff subsequently signed the agreement.

Plaintiff now states that "[t]he Hepp Defendants, by misstatement and omission, misrepresented the value of RSE by failing to disclose that, before the Merger, RSE had grossly overbilled IRE for overhead, rent, and administration, thereby inflating RSE's earnings and depressing IRE's earnings." Id. at ¶ 27. Consequently, Plaintiff argues that he paid far more for his interest in RSE than he would have if the relative values of the two companies were accurately presented by Defendants. Id.

### D. The Alleged Looting of RSE

Plaintiff's next series of claims arise from an ultimately uncompleted deal to sell all of RSE's assets to Stellar Refrigeration Services, Inc. ("Stellar"). Underlying these claims are the following facts as alleged by Plaintiff.

At some point on or before May 4, 2014, the Hepps reached an agreement in principle (the "Sale of Assets Agreement") with Stellar to sell all of RSE's assets, excluding cash and accounts receivable, to Stellar for a sum of $475,000, payable over a period of three years. Id. ¶ 51. Plaintiff believes that this low sum was accepted because the Individual Defendants negotiated large guaranteed sums or likely to occur contingent payments as part of their employment agreements with Stellar. Id. ¶ 63. Such action, if undertaken as alleged, would have resulted in Plaintiff receiving considerably less money from the sale of RSE's assets. Id.

Upon hearing of this agreement, Plaintiff notified Defendants that he elected to dissent from any decision to sell RSE's assets. Id. ¶ 56. At a shareholder's meeting, the Individual Defendants voted to approve the Sale of Assets Agreement with Stellar while Plaintiff voted

4

against the approval of the agreement. Id. ¶ 66. Prior to voting, Plaintiff avers that he offered $500,000 payable immediately in cash for the same assets covered in the Sale of Assets Agreement, which was subsequently rejected by the Individual Defendants. Am. Compl. at ¶ 68. The Individual Defendants deny that Plaintiff made any such offer. (Defs.' Resp. in Opp'n ¶ 17.) In light of this alleged rejection, Plaintiff believes the Individual Defendants' "real motivation to approve the deal with Stellar was and is to enjoy the benefits of artificially padded employment agreements and/or other consideration, and not to act in the best interests of RSE and its shareholders." Id. However, Defendant Philo is the sole Defendant presently employed by Stellar. (Defs.' Resp. in Opp'n ¶ 16.) Defendant Philo denies that any monetary consideration was diverted from the sale price of RSE's assets into his employment contract with Stellar. (Id.)

After the shareholder's meeting, Defendants shut down Plaintiff's email account with RSE. Am. Compl. ¶ 69. Also, Defendants instructed Plaintiff not to come into the office. Id. Defendants cited Plaintiff's vote against the Sale of Assets Agreement as the reason for their actions. Id. Plaintiff then sought and accepted employment with another refrigeration contracting company servicing the Philadelphia area. Id. ¶ 70.

On June 20, 2014, counsel for RSE sent a "litigation hold" letter to Plaintiff's new employer demanding the preservation of documents during the pendency of this action. Id. ¶ 71. Three days later, Plaintiff sent a "litigation hold" letter to Stellar, which included a similar demand. Id. At some point before June 30, 2014, RSE and Stellar decided against completing the Sale of Assets Agreement. Id. ¶ 74.

At a shareholder's meeting held on July 12, 2014, the Individual Defendants voted to commence a voluntary dissolution and liquidation of RSE's assets. Id. ¶ 75. Plaintiff, as a shareholder of RSE, voted against the dissolution. Id. ¶ 76. In response, Plaintiff filed a

"Motion of Judicial Supervision of Dissolution, or, in the Alternative, Appointment of a Receiver or Custodian," which the Court denied on September 17, 2014. See Spina v. Refrigeration, Service and Engineering, Inc., No. 14-4230, 2014 WL 4632427, at *3 (E.D. Pa. Sept. 17, 2014).

### E. The Instant Motion

On August 29, 2014, RSE filed a Motion to Dismiss the Amended Complaint for failure to state a claim. (See Def. RSE's Mot. to Dismiss.) The Hepp Defendants joined RSE's motion on September 4, 2014, and Defendant Philo joined on September 5, 2014. (See Notice of Joinder (Doc. Nos. 20, 21.)) Plaintiff filed a Response in Opposition on September 15, 2014.[5] (See Pl.'s Resp. in Opp'n.) On September 29, 2014, RSE filed a Reply to Plaintiff's Response, which was joined by the Hepp Defendants. (See Def. RSE's Reply; Notice of Joinder (Doc. No. 29)).

## II. STANDARD OF LAW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). Pursuant to Rule 12(b)(6), the defendant bears the burden of demonstrating that the plaintiff has failed to set forth a claim from which relief may be granted. Fed. R. Civ. P. 12(b)(6); see also Lucas v. City of Phila., No. 11-4376, 2012 WL 1555430, at *2 (E.D. Pa. May 2, 2012) (citing Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005)). In evaluating a motion to dismiss, the court must view any reasonable inferences from the factual allegations in a light most favorable to the plaintiff. Buck v. Hamilton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2002).

The Supreme Court set forth in Twombly, and further defined in Iqbal, a two-part test to determine whether to grant or deny a motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662,

---

[5] Plaintiff amended this Response on the following day to include a cover page and table of contents. (See Doc. No. 23.)

6

679 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Court of Appeals for the Third Circuit ("Third Circuit") has noted that these cases signify the progression from liberal pleading requirements to more "exacting scrutiny" of the complaint. Wilson v. City of Phila., 415 F. App'x. 434, 436 (3d Cir. 2011).

Initially, the court must ascertain whether the complaint is supported by well-pleaded factual allegations. Iqbal, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Twombly, 550 U.S. at 555. Conclusions of law can serve as the foundation of a complaint, but to survive dismissal they must be supported by factual allegations. Iqbal, 556 U.S. at 679. These factual allegations must be explicated sufficiently to provide a defendant the type of notice that is contemplated by Rule 8. See Fed. R. Civ. P. 8(a)(2) (requiring a short and plain statement of the claim showing that the pleader is entitled to relief); see also Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Where there are well-pleaded facts, courts must assume their truthfulness. Iqbal, 556 U.S. at 679.

Upon a finding of a well-pleaded complaint, the court must then determine whether these allegations "plausibly" give rise to an entitlement to relief. Id. at 679. This is a "context specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. Plausibility compels the pleadings to contain enough factual content to allow a court to make "a reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. 544 at 570). This is not a probability requirement; rather plausibility necessitates "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility.'" Id. (quoting Twombly,

550 U.S. at 557). In other words, a complaint must not only allege entitlement to relief, but must demonstrate such entitlement with sufficient facts to nudge the claim "across the line from conceivable to plausible." Id. at 683; see also Holmes v. Gates, 403 F. App'x 670, 673 (3d Cir. 2010).

## III. DISCUSSION

Plaintiff asserts two claims under federal law for securities fraud and control person liability. The Court possesses original jurisdiction over these claims because they arise under federal law.[6] See 28 U.S.C. § 1331. In addition, Plaintiff alleges a bevy of state law claims arising from the merger, shareholder derivative rights and the alleged looting of RSE. We exercise supplemental jurisdiction over these claims.[7] See 28 U.S.C. § 1367.

### A. Securities Fraud Claim

In Count I, Plaintiff asserts that Defendants engaged in fraudulent activities in relation to his purchase of shares of RSE in violation of 15 U.S.C. § 78(j) and Securities and Exchange Commission Rule 10b-5. Am. Compl. ¶ 124. Specifically, Plaintiff states that he did not know and had no reason to know that due to the fraud, he was being overcharged for shares in RSE. Id. ¶ 130. Under Section 10(b) of the Exchange Act the use "in connection with the purchase or sale of any security [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe" is prohibited. 15 U.S.C. § 78j(b). Rule 10b–5 was promulgated in connection with Section 10(b) and "provides the framework for

---

[6] Pursuant to 28 U.S.C. § 1331, "[T]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

[7] Under 28 U.S.C. § 1367, where the district court has original jurisdiction over a civil action, the court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." See 28 U.S.C. § 1367(a).

a private cause of action for violations involving false statements or omissions of material fact." See Tracinda Corp. v. DaimlerChrysler AG, 197 F. Supp. 2d 42, 54 (D.Del. 2002) (quoting Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997)).

Defendants' Motion to dismiss the securities fraud claim raised by Plaintiff is predicated on two grounds.[8] First, Defendants contend that the pleadings lack the requisite particularity for fraud claims. Second, Defendants argue that the applicable statute of limitations bars Plaintiff's claim. Because we find the second issue to be determinative in this case, we solely address whether dismissal is warranted on statute of limitations grounds.

In response to Defendants' Motion, Plaintiff raises procedural and substantive arguments in favor of denying the application of the limitations defense. Procedurally, Plaintiff asserts that a 12(b)(6) motion is not the proper vehicle for a statute of limitations defense. Substantively, Plaintiff contends that his claim was filed within the applicable two-year limitations period. We proceed to address each argument in turn.

### 1. Procedural Issues

"Technically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in the answer, not in a motion to dismiss." Schmidt v. Skolas, No. 13-3750, 2014 WL 5303002, at *4 (3d Cir. Oct. 17, 2014). However, a limitations defense is permissible within this Circuit "only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" Robinson v. Johnson, 313 F.3d 128, 134-35 (3d Cir. 2002) (quoting Hanna v. U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975)). Thus, to raise a statute of

---

[8] In light of the fact that the Individual Defendants joined in RSE's Motion to Dismiss, we designate it as Defendants' Motion to Dismiss.

limitations defense in a 12(b)(6) motion, the bar must be apparent on the face of the complaint. Schmidt, 2014 WL 5303002, at *4.

Upon review of the Amended Complaint, we find that Defendants' invocation of the limitations defense is permissible because the statement of the claim evidences that it was not brought within the applicable two year limitations period. It is evident from the Amended Complaint that Plaintiff's fraud claim arises from the valuations of RSE and IRE pronounced in the Haas Report[9] and the representations made by Defendants prior to the purchase agreement on December 29, 2011. See Am. Compl. ¶¶ 22-23. Since Plaintiff's claim is subject to a two year limitations period, Plaintiff was required to file suit on or before December 29, 2013. However, Plaintiff filed the instant suit in May of 2014. As such, it is apparent from the face of the Amended Complaint that the statute of limitations is implicated, and that the affirmative defense raised by Defendants is procedurally proper. See Schmidt, 2014 WL 5303002, at *4; Robinson, 313 F.3d at 134-35. In addition, practical considerations support allowing the Defendants to raise a limitations defense at this time. See Robinson, 313 F.3d at 137 ("If a party has a successful affirmative defense, raising that defense as early as possible, and permitting a court to rule on it, may terminate the proceedings at that point without wasting precious legal and judicial resources.").

---

[9] We note that the Haas Report, which is attached to the Amended Complaint, is properly within the purview of the documents permissible on review of a 12(b)(6) motion. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.").

## 2. Substantive Issues

Under 28 U.S.C. § 1658, "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of: (1) two years after the discovery of the facts constituting the violation; or (2) five years after such violation." 28 U.S.C. § 1658(b). In this case, the parties agree that a two year limitations period applies to Plaintiff's securities fraud claim. However, the parties disagree as to when the statute of limitations began to run. Defendants argue that the starting point for the statute of limitations was no later than the date of the purchase agreement, which occurred on December 29, 2011. (See Defs.' Mot. to Dismiss, 43.) In contrast, Plaintiff contends that the statute of limitations did not begin running until early 2013, when "understandable, concrete evidence" of fraud could have been discovered. (See Pl.'s Resp. in Opp'n, 53.)

In this Circuit, an inquiry notice standard governs the commencement of the statute of limitations period in securities fraud actions. See Benak v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 400 (3d Cir. 2006); In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1326 (3d Cir. 2002). Under the inquiry notice standard, the statute of limitations for the fraud action begins to run when a plaintiff "discovered or in the exercise of reasonable diligence should have discovered the basis for their claim" against the defendant. Benak, 435 F.3d at 400 (quoting Gruber v. Price Waterhouse, 697 F. Supp. 859, 863 (E.D. Pa. 1988)). The determination of whether a plaintiff,

11

in the exercise of reasonable diligence, should have known the basis for his fraud claim depends on whether they had "sufficient information of possible wrongdoing" to put them on "'inquiry notice' or to excite 'storm warnings'[10] of culpable activity." Id. This is an objective question; thus, an investor is not on inquiry notice until a "'reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'"[11] In re Merck & Co., Inc. Securities, Derivative & ERISA Litig., 543 F.3d 150, 161 (3d Cir. 2008) (quoting Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 252 (3d Cir. 2001)). Once, "the existence of storm warnings is adequately established the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 216 (3d Cir. 2007).

Viewing the record through the lens of the inquiry notice standard, we hold that as of December 29, 2011, Plaintiff should have known of the basis for his securities fraud claim for the following reasons. First, the valuations set forth in the Haas Report would have put an

---

[10] The Third Circuit in Mathews elaborated on what constitutes a "storm warning" in stating,
> [S]torm warnings may take numerous forms, and we will not attempt to provide an exhaustive list. They may include, however, 'substantial conflicts between oral representations of the brokers and the text of the prospectus, . . . the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased,' or 'any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.'

Mathews, 260 F.3d at 252.

[11] Although Plaintiff asserts that he is "unsophisticated in financial issues," he is held to the reasonable investor of ordinary intelligence standard for the purposes of this Motion. See Am. Compl. ¶ 40; see also In re Merck, 543 F.3d at 161 (finding this is the appropriate standard).

12

ordinary investor on notice of the possibility of securities fraud.[12] The Haas Report forms the backbone of Plaintiff's claim, and Plaintiff, through the utilization of basic mathematical principals, should have discovered that his percentage in IRE was worth markedly more than his acquired percentage in RSE.[13] The disparity in values alone should have alerted Plaintiff to the possibility of securities fraud. See Mathews, 260 F.3d at 252 (stating that financial data can comprise a "storm warning"). Moreover, Plaintiff's ownership interest in IRE, the active role he undertook in IRE's operations and the close relationship between IRE and RSE, placed Plaintiff in the perfect position to have first-hand knowledge of the actual respective values of IRE and RSE. See Am. Compl. ¶ 37 (Plaintiff states that at the time of the sale, RSE was substantially less valuable than IRE, as conclusively evidenced by the sales and service functions of the two entities). On its face, the Report details that RSE was worth almost three times the value of IRE. This valuation is inconsistent with Plaintiff's contention that IRE had "contributed most of the expertise and customer relationships on which the combined enterprise depended." Am. Compl. ¶ 13. Thus, we believe Plaintiff's contentions to be illogical and incompatible with his own

---

[12] The record exhibits that Plaintiff received the Haas Report on December 29, 2011. Am. Compl. ¶ 39. For purposes of this analysis, Plaintiff is assumed to have read the Report. See Mathews, 260 F.3d at 252 (stating that investors are presumed to have read information related to their investments).

[13] We reach this conclusion based upon the following facts. IRE was valued at $672,000. Am. Compl. Ex. 1. Plaintiff owned a one-third (33-1/3%) interest in IRE, which was worth $223,977.60. Id. RSE was valued at $1,507,000. Id. Upon acceptance of the terms of sale of RSE, Plaintiff would own thirty percent (30%) of RSE, which would be worth $452,100. Id. However, Plaintiff had to include a cash payment of $294,000 along with his shares of IRE in order to purchase the thirty percent (30%) share of RSE. Id. Adding the value of Plaintiff's IRE shares and the cash payment, Plaintiff paid $517,977.60 for a thirty percent (30%) interest in RSE, which was worth $452,100. From these easily ascertainable figures, it is evident that Plaintiff overpaid in the amount of $65,877.60 for the shares of RSE. Id.

statements as to the value of IRE respective to RSE. As such, we find that financial data encompassed in the Haas Report would have alerted a "reasonable person to the probability that misleading statements or significant statements had been made." See Mathews, 260 F.3d at 252 (holding that the "accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased" constitutes "storm warnings").

Second, in the eyes of the Court, the conduct undertaken by Defendants, as alleged by Plaintiff in the Amended Complaint, should have further alerted Plaintiff to Defendants' possible wrongdoing. For example, according to Plaintiff the deal initially was a swap of his ownership interests in IRE for interests in RSE without any additional financial considerations. Am. Compl. ¶ 19. However, to complete the acquisition of a thirty percent (30%) ownership in RSE, Plaintiff was required to give up his one-third (33-1/3%) ownership interest in IRE plus a cash payment of $294,000. Id. ¶ 23. This change in the original terms should have led Plaintiff to question the legitimacy of Defendants' actions. The fact that Plaintiff had only one day to review the files and agree to the acquisition terms ought to have further aroused Plaintiff's suspicions. Id. ¶ 39. Plaintiff concedes this fact by stating, "[n]o responsible corporate officials would demand that a minority shareholder make an immediate decision concerning consent to a merger without affording sufficient time to study that decision, unless such officials intended to

misrepresent and conceal material facts." Id. ¶ 54(g). Accordingly, we find that Defendants' conduct should have placed Plaintiff on notice.

Since Defendants have established "storm warnings," the burden shifts to Plaintiff to show that he exercised reasonable due diligence, but was still unable to discover the fraud. See Benak, 435 F.3d at 400; Mathews, 260 F.3d at 252. In order to carry his burden and avoid the limitations bar, Plaintiff cannot rely on a "lack of knowledge of the specific details or narrow aspects of the alleged fraud." In re NAHC, 306 F.3d 1314, 1326 (3d Cir. 2002) (quoting In re Prudential Ins. Co. of Am. Sales Practices Litig., 975 F. Supp. 584, 599 (D.N.J. 1997)). Nor can Plaintiff protect his claim by attesting to the difficulty of discovering the alleged fraud. See Id. at 1327; Mathews, 260 F.3d at 252 n.16 (denying this argument for practical reasons stating that excusing the failure to inquire would discourage investigation). Nonetheless, this is precisely the strategy that Plaintiff employs in rejecting Defendants' arguments. Plaintiff contends that "[a]s of December 29, 2011, [he] was in no position to know, and had no reason to know anything about the value of RSE, or the relative values of RSE and IRE." (Pl.'s Resp. in Opp'n, 52.) However, as stated previously, the Court finds the opposite to be true. In cases such as this, where the Court has found that "suspicious circumstances" exist, Plaintiff must demonstrate that he investigated the matter. See In re NAHC, 306 F.3d at 252 (holding that after a defendant demonstrates the presence of storm warnings, the burden shifts to plaintiff to show that they investigated the suspicious circumstances) (citing Mathews, 260 F.3d at 252). Here, Plaintiff has

failed to make any such showing. Consequently, we find that Plaintiff was on inquiry notice as of December 29, 2011. Id. (holding that where plaintiff does not investigate storm warnings, they are "deem[ed] . . . on inquiry notice of the claims."). Since Plaintiff's securities fraud claim was not raised within two years of this date, we hold that it is precluded by the statute of limitations. We reach this conclusion as a matter of law after drawing all reasonable inferences in favor of Plaintiff and in light of the appropriate record before the Court. See Edelson V., L.P. v. Encore Networks, Inc., No. 11-5802, 2013 WL 1952309, at *9 (D.N.J. May 9, 2013) (stating that where the complaint fails to allege facts to toll the statute of limitations, a motion to dismiss based on the statute of limitations should be granted).

### B. Control Person Liability

In his control person liability claims, Plaintiff alleges that Defendant Robert Hepp, as the "control person," caused misrepresentations to be propagated by other agents of RSE (including Defendant Cynthia Hepp and certain appraisers, attorneys, and accountants retained by RSE) in violation of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). Am. Comp. ¶ 143. Section 20(a) provides that,

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . ., unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Based upon this statutory language, the United States Court of Appeals for the Third Circuit ("Third Circuit") has directed that a plaintiff must "prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act. If no controlled person is liable, there can be no controlling person liability." In re Alpharma Inc. Securities Litig., 372 F.3d 137, 153 (3d Cir. 2004), *abrogated on other grounds by* Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007). In other words, a violation of the Exchange Act is a prerequisite to establishing liability under the statute. Here, the dismissal of Plaintiff's securities fraud claim on procedural grounds is fatal to Plaintiff's control person liability claim. See Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir. 1992). Consequently, Plaintiff's control person liability claim is dismissed. Id.

### C. The Remaining State Law Claims

The Court's jurisdiction at the inception of this case was pursuant to Plaintiff's claims under federal law. However, these claims have been dismissed, and the Court may now re-examine whether to proceed with Plaintiff's remaining state law claims. See 28 U.S.C. § 1367(c). A district court may decline to exercise supplemental jurisdiction over a claim in the following four situations: (1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or, (4) in exceptional circumstances, there are other compelling reasons for

17

declining jurisdiction. Id. Thus, § 1367 grants the Court with the discretion to proceed on the state law claims in this case. New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1508 (3d Cir. 1996). Utilizing this discretion, we decline to exercise jurisdiction of the state law claims. See McCoy-McMahon v. Goodlove, No. 08-5989, 2011 WL 4820185, at *17 (E.D. Pa. Sept. 30, 2011) (declining the exercise of jurisdiction over state law claims where federal claims were dismissed). Accordingly, this action is remanded to the Court of Common Pleas of Montgomery County, Pennsylvania.

## IV.     CONCLUSION

For the aforementioned reasons, Defendants' Motion to Dismiss is granted as to Plaintiff's federal law claims against Defendants. The remaining state law claims are remanded to the Court of Common Pleas of Montgomery County, Pennsylvania.